### THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**LASHAUN MCFADDEN, Personal**
**Representative of the Estate of Tyrone**
**Washington, deceased, Individually, and as**
**Next Friend of Minor Washington #1, a**
**Minor, and Minor Washington #2, a Minor**                    **PLAINTIFF**

**v.**                    **Case No. 4:22-cv-00624-KGB**

**KRYSTAL WATSON, *et al.***                    **DEFENDANTS**

### OPINION AND ORDER

Plaintiff Lashaun McFadden brings this action pursuant to 42 U.S.C. § 1983, citing the

Fourth and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of

1871, and pursuant to the Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C.

§ 1395dd, *et seq*., as personal representative of the estate of Tyrone Washington, deceased,

individually, and as next friend of minor Washington #1, a minor, and minor Washington #2, a

minor (Dkt. No. 34, ¶ 1).    In her second amended complaint (hereinafter the "operative

complaint"),[1] Ms. McFadden asserts claims against defendants Krystal Watson, in her individual

capacity; Devon Smith, in his individual capacity; Garan Blagg, in his individual capacity; Sean

Barber, in his individual capacity;[2] and the Board of Trustees of the University of Arkansas ("the

Board") (collectively "defendants") (*Id.*).[3] Defendants filed a motion for summary judgment (Dkt.

---

[1]   The Court adopted the parties' stipulation of dismissal without prejudice of St. Vincent
Infirmary Medical Center, Inc. (Dkt. No. 37).
[2]   Although Ms. McFadden's operative complaint specifies that she is suing
defendants "individually," defendants in their motion for summary judgment state that
"McFadden raises her claims against the individual defendants in both their personal and
official capacities; however, only Corporal Blagg is still employed at UAMS and has an
official capacity." (Dkt. No. 51, at 2).
[3]   In her operative complaint, Ms. McFadden brings the following claims against the
following defendants: (1) Count 1:  Officer Watson for excessive force in violation of the Fourth

No. 49), to which Ms. McFadden responded in opposition (Dkt. No. 59).  Defendants replied to Ms. McFadden's response (Dkt. No. 71).  Over four months after the summary judgment briefing was complete but before the Court ruled on the motion, Ms. McFadden filed a motion to strike (Dkt. No. 77).  Defendants have responded in opposition to the motion to strike (Dkt. No. 79).  For the following reasons, the Court denies Ms. McFadden's motion to strike (Dkt. No. 77).  The Court grants, in part, and denies, in part, defendants' motion for summary judgment (Dkt. No. 49).

## I.    Motion To Strike

Ms. McFadden argues that the Court should strike portions of Chief Barrentine and Lieutenant Galluppo's affidavits, which defendants offer in support of their motion for summary judgment, because Ms. McFadden asserts the affidavits contain "improper legal conclusions, are not based on the affiant's personal knowledge and/or lack proper foundation" in violation of Federal Rule of Civil Procedure 56 (Dkt. No. 77, at 1–2).  Specifically, Ms. McFadden moves to strike paragraphs five through 10 of Chief Barrentine's affidavit (Dkt. No. 49-9), asserting that the paragraphs consist of legal conclusions and statements not based on personal knowledge (Dkt. No. 78, at 3–5).    Additionally, Ms. McFadden seeks to strike paragraphs four through eight of Lieutenant Galluppo's affidavit (Dkt. No. 49-1), contending that the paragraphs are not based on personal knowledge and lack foundation (Dkt. No. 78, at 5–7).  Defendants filed a response to Ms. McFadden's motion to strike in which they assert that the motion should be denied because the

---

Amendment (Dkt. No. 34, at 18); (2) Count 2:  Officer Watson for wrongful death (*Id*., at 21); (3) Count 3:  Officer Watson for survival pursuant to Arkansas Code Annotated § 16-62-101(a)(1) (*Id*., at 22); (4) Count 4:  Officer Watson, Officer Smith, Corporal Blagg, and Officer Barber for failure to intervene (*Id*., at 23); and (5) Count 5:  the Board for violations of the federal EMTALA statute (*Id*., at 25).

motion is not properly before the Court and because, even if it was properly before the Court, the motion is untimely (Dkt. No. 79).

The Court agrees with defendants that Ms. McFadden's motion is not properly before the Court. Under Federal Rule of Civil Procedure 12(f), a motion to strike may be "made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading." Fed. R. Civ. P. 12(f). Here, defendants' motion for summary judgment including the affidavits that Ms. McFadden seeks to strike was served on Ms. McFadden on January 17, 2025 (Dkt. No. 49). Ms. McFadden did not file her motion to strike until July 8, 2025, nearly five months after she filed her response, well past the 21-day deadline set out in Federal Rule of Civil Procedure 12(f) (Dkt. Nos. 59; 77). Accordingly, Ms. McFadden's motion to strike is not timely. Fed. R. Civ. P. 12(f).

Additionally, Ms. McFadden's motion to strike is premised on a misconception. Federal Rule of Civil Procedure 12(f) grants district courts the power to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Courts may do so either *sua sponte* or upon motion made by a party either before responding to the pleading or, if a response is allowed, within 21 days after being served with the pleading. Fed. R. Civ. P. 12(f)(1)–(2). Federal Rule of Civil Procedure 7(a) defines a pleading as one of seven specific types of filings. Motions, responses to motions, and affidavits supporting motions are not considered pleadings under Rule 7(a). Fed. R. Civ. P. 7(a). As such, they are not properly the object of a motion to strike. *Palmer Holdings and Invs., Inc. v. Integrity Ins. Co.*, 505 F. Supp. 3d 842, 862 (S.D. Iowa 2020); *All Energy Corp. v. Energetix, LLC*, 985 F. Supp. 2d 974, 984 (S.D. Iowa 2012); *Mecklenburg Farm v. Anheuser-Busch, Inc.*, 250 F.R.D. 414, 420 n.7 (E.D. Mo. 2008)

("Motions, briefs, memoranda, objections or affidavits may not be attacked by a motion to strike.").

For these reasons, Ms. McFadden's motion to strike is not properly raised for purposes of Rule 12(f), and the Court declines to exercise its discretion to strike the disputed statements in either Chief Barrentine or Lieutenant Galluppo's affidavits.  Instead, the Court "treats the argument[s] in favor of the Motion to Strike as a challenge to the significance that the Court should accord to" the disputed statements.  *Palmer Holdings and Invs. Inc.*, 505 F. Supp. 3d at 862.  In conducting its summary judgment analysis, the Court will therefore give them such weight as they properly merit in the light of Rule 56 and Local Rule 56.1.

Pursuant to Federal Rule of Civil Procedure 56(c)(4), an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  The Court turns to Ms. McFadden's challenge to paragraphs five through 10 of Chief Barrentine's affidavit.  Having examined the entire record in this case, it appears to the Court that in paragraphs five, nine and 10 of his affidavit, Chief Barrentine makes fact-based statements based on personal knowledge, and there are ways in which such facts would be admissible in evidence at trial (Dkt. Nos. 49-9; 59-1, at 152; 79, at 3-4).

Defendants, in their response to the motion to strike, point out that the foundation for Chief Barrentine's testimony in paragraphs six, seven, and eight was laid in Chief Barrentine's deposition when Ms. McFadden's counsel elicited opinion testimony from Chief Barrentine regarding whether he believed the shooting was a justified use of deadly force and whether he thought it was objectively reasonable under the legal standards in which law enforcement are trained (Dkt. No. 59-7, at 31-33).  During his deposition testimony, Chief Barrentine established

that his testimony was based on his personal knowledge as a former chief of police and law enforcement officer, as well as his review of the video of the incident (*Id.*). The foundation for his opinion was laid by Ms. McFadden's attorney at Chief Barrentine's deposition. The Court declines to strike the testimony at this stage. However, the Court acknowledges that there may be limits on the use of such testimony at trial, given controlling case law on testimony related to police practices and inadmissible testimony related to legal conclusions.

With respect to Ms. McFadden's challenge to Lieutenant Galluppo's affidavit, Ms. McFadden first challenges that Lieutenant Galluppo's affidavit is "vague and lacks foundation regarding the identity of the individual or agency that assigned her investigation tasks or otherwise directed her actions." (Dkt. No. 78, at 6). As set forth herein, the Court has reviewed the entire record in this matter and it is clear from Chief Barrentine's testimony as well as Lieutenant Galluppo's affidavit that she was a Lieutenant with the University of Arkansas for Medical Sciences Police Department ("UAMS PD"), the shooting on the campus of the University of Arkansas for Medical Sciences ("UAMS") was being investigated by the Arkansas State Police ("ASP"), and Chief Barrentine charged Lieutenant Galluppo with collecting information available to UAMS PD that was requested by ASP and with delivering the information to ASP investigators (Dkt. Nos. 49-1, ¶¶ 1-4; 59-7, at 7-8). The Court overrules Ms. McFadden's objection to Lieutenant Galluppo's testimony as vague and lacking foundation.

As to Ms. McFadden's objections to paragraphs five through eight of Lieutenant Galluppo's affidavit, having examined the entire record in this case, the Court determines that in paragraphs five through eight of her affidavit Lieutenant Galluppo makes straightforward factual statements about actions that she took as the UAMS PD officer charged by Chief Barrentine to act as a liaison between UAMS PD and the ASP, to collect and submit evidence to the ASP. The

statements were made based on Lieutenant Galluppo's personal knowledge; the Court determines that there are ways in which such statements would be admissible in evidence at trial (Dkt. No. 49-1, ¶¶ 4-8). Ms. McFadden alludes to Lieutenant Galluppo not being a VA employee and "chain of custody" issues regarding a video obtained from the VA. However, Lieutenant Galluppo attests that the videos were not edited or tampered with by UAMS personnel, and perhaps more importantly, Ms. McFadden submits the same video evidence in her response to defendants' motion for summary judgment (Dkt. No. 59-19). The Court has reviewed and relied on the video provided by both Ms. McFadden and defendants in making its determination in this matter.

For these reasons, the Court denies Ms. McFadden's motion to strike (Dkt. No. 77). The Court gives the challenged statements due consideration in the light of Federal Rule of Civil Procedure 56 and Local Rule 56.1.

## II.    Factual Background

Defendants filed a statement of undisputed material facts in support of their motion for summary judgment (Dkt. No. 51). Ms. McFadden filed answers to the statement of undisputed facts (Dkt. No. 60). The following facts are taken from both defendants' statement of undisputed material facts and the portions of Ms. McFadden's answers that have not been disputed by defendants and that are supported by the record. To the extent the parties disagree on purported statements of undisputed material fact, the Court has not deemed those facts undisputed. In reaching a determination on the pending motion for summary judgment, the Court has reviewed the record evidence in this case in the light most favorable to Ms. McFadden, as the Court is required to do at this stage.

On December 3, 2020, at approximately 1:55 a.m., Mr. Washington stole a truck belonging to Arkansas Power Wash that was parked outside of a building on the UAMS campus (Dkt. No.

51, ¶ 1).[4]  Officer Watson learned about the stolen Arkansas Power Wash truck while she was driving down Shuffield Drive on UAMS's campus towards the cancer institute and was flagged down by two individuals (Dkt. No. 60, ¶ 2).  At the same time, Officer Watson received a call from dispatch saying there was a stolen vehicle in the area (*Id.*).  The two individuals who flagged Officer Watson down were Arkansas Power Wash employees, and they told her about the stolen truck (*Id.*, ¶ 3).  Officer Watson took down the details about the truck and returned to the UAMS PD office in the Emergency Department ("ED") to write a report. (*Id.*, ¶ 4).

While driving around campus, Mr. Washington stopped on two occasions to tell random UAMS employees who he saw outside that he was being chased by a man with a machete (*Id.*, ¶ 5).  Mr. Washington first told this to a group of nurses on a break outside of the Psychiatric Research Institute, including nurse Hayley Liston (*Id.*, ¶ 6).  Mr. Washington later told groundskeeper Kenneth Bailey, who was leaving the ED after reporting for his daily COVID screening before his shift began, that someone was chasing him with a machete (*Id.*, ¶ 7).  At approximately 2:46 a.m., Mr. Bailey called the UAMS PD to report that an individual in a white

---

[4]  Ms. McFadden denies the statement of fact "as phrased." (Dkt. No. 60, ¶ 1).  Ms. McFadden does not support the denial with any relevant, admissible evidence in the record before the Court as required by Federal Rule of Civil Procedure 56(c).  *See* Fed. R. Civ. P. 56(e)(2) ("If a party fails to [support] properly an assertion of fact or fails to [address] properly another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion").  Ms. McFadden asserts that Mr. Washington has an "affirmative defense" to Officer Watson's "apparent belief that she had probable cause to arrest Mr. Washington for theft of property" because Mr. Washington had a mental disease or defect and could not "conform his conduct to the requirements of law; or appreciate the criminality of his conduct" pursuant to Arkansas Code Annotated § 5-2-312(a)(1)(A)-(B), but Ms. McFadden offers no record evidence of a medical diagnosis of a mental disease or defect for Mr. Washington other than Mr. Washington's self-reported diagnosis of schizophrenia during a prior visit to UAMS ED when Mr. Washington sought treatment for back pain (Dkt. No. 59-25, at 1).  Because Ms. McFadden offers no admissible evidence in the record before the Court to support properly her assertion of a diagnosis of a mental disease or defect for Mr. Washington, the Court deems the statement of fact undisputed for purposes of this motion under Federal Rule of Civil Procedure 56(e)(2).

truck stated that he was being chased by someone with a machete (*Id.*, ¶ 8). Mr. Washington did not tell the nurses or groundskeeper that he needed medical assistance (*Id.*, ¶ 9). Mr. Washington did not act in a manner leading the nurses or groundskeeper to believe he needed medical assistance (Dkt. No. 51, ¶ 10).[5]

At approximately 2:45-2:50 a.m., Lieutenant Redd stopped on Shuffield Drive to speak to a man in a white truck in the middle of the road who wanted to speak to him (Dkt. No. 60, ¶ 11). Lieutenant Redd initially engaged Mr. Washington without exiting his police vehicle (*Id.*). Mr. Washington reported to Lieutenant Redd that "a guy with a machete was trying to jump him," so he was "going to get outta here." (Dkt. Nos. 60, ¶ 12; 49-6). Officer Watson, who had been leaving the UAMS PD office in the ED to respond to the machete call, saw the white truck and Lieutenant

---

[5] Ms. McFadden cites to evidence in the record for her denial of this statement of fact, but the Court writes to clarify confusion that may arise from the cited evidence. For example, Ms. McFadden states in her answer to the statement of fact that UAMS employee Renata Franco gave a statement to ASP in which she stated that Mr. Washington asked "if they had seen the guy who clearly was a figment of his hallucinations" (Dkt. No. 60, ¶ 10). What Ms. Franco said in her statement to the ASP investigator was that Mr. Washington asked if they had seen the guy with a machete coming after him (Dkt. No. 70-15, at 2:20). Further, Ms. McFadden in her answer to the statement of fact characterizes Nurse Liston's testimony as concluding that Mr. Washington's complaining about a "machete-wielding attacker" is "consistent with a person experiencing hallucinations" and "is consistent with schizophrenia." (Dkt. No. 60, at 4). Nurse Liston testified at her deposition that Mr. Washington never asked for treatment, never asked for help, and did not have a flat affect, and she concluded, based on her experience, that he might be "on something or there was something else he was dealing with" (Dkt. No. 59-5, at 38). Mr. Bailey offered to call the UAMS PD (Dkt. No. 49-4, at 4–5). Mr. Bailey testified that he did not make "any inferences or conclusions" regarding Mr. Washington's mental state or acuity, and he did not suspect Mr. Washington was having a mental health or drug-induced crisis, or that he was hallucinating (Dkt. Nos. 49-4, at 4–5; 59-6, at 6). While Mr. Washington seemed "jittery and nervous" and not "acting normally," Mr. Bailey stated, "I would be too, you know, if I was in that position. . . someone chasing me with a machete." (Dkt. No. 59-6, at 6). Because Ms. McFadden has not offered admissible evidence on the record before the Court for her denial of this statement of fact, the Court deems defendants' statement of fact undisputed for purposes of this motion under Federal Rule of Civil Procedure 56(e)(2).

Redd in the middle of Shuffield Drive, and she drove her police vehicle up to the area (Dkt. No. 51, ¶ 13).

Officer Watson approached the vehicle on foot. Officer Watson saw an identifying number on the front of the truck that matched the number on the stolen truck, and she advised Lieutenant Redd of the same (*Id.*, ¶ 19). Lieutenant Redd turned his vehicle around to position it in front of Mr. Washington in the stolen truck (Dkt. No. 60, ¶ 20). Because the truck was stolen, the matter with Mr. Washington became a felony stop (Dkt. No. 51, ¶ 21).[6]

Officer Smith, who was already nearby, pulled his vehicle up next to Mr. Washington (Dkt. No. 60, ¶ 22). Corporal Blagg responded on foot from the ED (*Id.*, ¶ 23). Officer Barber arrived on the scene last in his patrol vehicle (*Id.*, ¶ 24). Corporal Blagg approached the driver's side window of the truck, and Officer Smith approached the passenger's side window of the truck (*Id.*, ¶ 25). Officer Smith knocked on the passenger side window while Lieutenant Redd and Corporal Blagg were talking to Mr. Washington at the driver's side window (*Id.*). The driver's side window was down, and Corporal Blagg asked Mr. Washington to turn off the truck and step out (*Id.*, ¶ 27).[7] Corporal Blagg tried to open the driver's side door, but it was locked (*Id.*, ¶ 29).

Lieutenant Redd, the shift Lieutenant, was the ranking officer on the scene (*Id.*, ¶ 31). When Lieutenant Redd arrived at the window, he instructed Mr. Washington to get out of the truck

---

[6] Ms. McFadden answers that she cannot admit or deny these statements of fact (Dkt. No. 60, ¶ 27). Defendants support these statements of fact with sworn testimony in the record before the Court (Dkt. No. 51, ¶ 27). Ms. McFadden does not point to any testimony or other evidence in the record to refute these statements of fact. Accordingly, the Court deems the statements of fact undisputed for purposes of this motion under Federal Rule of Civil Procedure 56(e)(2).

[7] Ms. McFadden answers that she cannot admit or deny these statements of fact (Dkt. No. 60, ¶ 27). Defendants support these statements of fact with sworn testimony in the record before the Court (Dkt. No. 51, ¶ 27). Ms. McFadden does not point to any testimony or other evidence in the record to refute these facts. Accordingly, the Court deems the statements of fact undisputed for purposes of this motion under Federal Rule of Civil Procedure 56(e)(2).

(Dkt. No. 51, ¶ 32).[8]  Mr. Washington did not exit the truck (Dkt. No. 60, ¶ 33).  Lieutenant Redd then reached into the truck for the ignition key in an attempt to turn the truck off and remove the keys (*Id.*, ¶ 34).  While Lieutenant Redd's hands were in the vehicle, Mr. Washington began to move the vehicle forward while turning the steering wheel (Dkt. No. 51, ¶ 35).[9]

Lieutenant Redd attempted to steer the truck into the parking deck wall with an intent of trying to stop it against the wall, but Mr. Washington gained control of the steering wheel and turned the truck away from the wall (Dkt. No. 60, ¶ 37).[10]  While Lieutenant Redd tried to remove his hands from the truck, the truck began to move forward causing him to have to run alongside the truck while his hands were still inside (Dkt. No. 51, ¶ 38).[11]

Officer Watson, who had been behind the truck and to the driver's side (she is not initially seen on the video), saw the truck begin to move while Lieutenant Redd had his hands inside the truck, and Officer Watson began to run ahead around Lieutenant Redd's vehicle (Dkt. Nos. 51, ¶

---

[8]  Ms. McFadden answers that she cannot admit or deny this statement of fact (Dkt. No. 60, ¶ 27).  Defendants support this statement of fact with sworn testimony in the record before the Court (Dkt. No. 51, ¶ 32).  Ms. McFadden does not point to any testimony or other evidence in the record to refute the statement of fact.  Accordingly, the Court deems the statement of fact undisputed for purposes of this motion under Federal Rule of Civil Procedure 56(e)(2).

[9]  Ms. McFadden denies this statement of fact and urges the Court to include a statement that Lieutenant Redd was acting voluntarily, voluntarily disengaged, and could have voluntarily disengaged at any time (Dkt. No. 60, ¶ 12).  The Court does not view this as a statement of fact relevant to the Court's use of force analysis because the Court's standard of review is an objective one that requires an assessment of what the officer using force knew at the time.  *See Graham,* 490 U.S. at 396 (determining that all the facts and circumstances "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.").  Officer Watson did not have the benefit of knowing that Lieutenant Redd could have disengaged at any time or that he intended to disengage voluntarily from the vehicle.  Accordingly, the Court does not include these as material facts.

[10]  Ms. McFadden answers that she cannot admit or deny these statements of fact (Dkt. No. 60, ¶ 37).  Defendants support these statements of fact with sworn testimony in the record before the Court (Dkt. No. 51, ¶ 37).  Ms. McFadden does not point to any testimony or other evidence in the record to refute these facts.  Accordingly, the Court deems the statements of fact undisputed for purposes of this motion under Federal Rule of Civil Procedure 56(e)(2).

[11]  *See* n.7.

40; 60, ¶ 40).[12]  Officer Watson had already pulled her service weapon (Dkt. Nos. 51, ¶ 41; 60, ¶ 41).[13]  Officer Watson raised her weapon and fired one shot (Dkt. No. 60, ¶ 48).  The shot struck Mr. Washington in the head, and officers contacted dispatch for emergency medical assistance (*Id.*, ¶ 53).  Mr. Washington was admitted to the hospital for his injuries and subsequently died on December 4, 2020 (*Id.*, ¶ 55).

Lieutenant Redd fell next to the side of the truck (*Id.*, at ¶ 46), but the parties dispute whether Mr. Washington was dragging Lieutenant Redd on the side of truck or whether Lieutenant Redd was on the ground at the time that Officer Watson fired the single shot from her weapon.[14]  Officer Watson testified that Lieutenant Redd was hanging on the side of the truck when she fired her weapon (Dkt. No. 59-1, at 141).  Corporal Blagg testified that, as Lieutenant Redd "went to fall," Officer Watson fired the shot (Dkt. No. 59-2, at 50, 67:25-68:4).  Officer Smith testified that Lieutenant Redd was on the ground when Officer Watson fired her weapon (Dkt. No. 59-3, at 17, 67:25-68:2), and Officer Barber gave a statement to the ASP that Lieutenant Redd was on the ground at the time that Officer Watson fired her weapon (Dkt. No. 59-4, at 16, 63:11–15; 59-13, at 9:55).  Lieutenant Redd gave a statement to ASP stating that, when he hit the ground, he heard the gun shot (Dkt. No. 49-7, at 4).  Finally, Chief Barrentine testified that at the "same time [Lieutenant Redd] was going down," Officer Watson shot Mr. Washington (Dkt. No. 49-16, at 6, 31:17-21).

---

[12] *See* n.7.

[13] *See* n.7. The parties dispute the reason for Officer Watson pulling her service weapon.

[14] Lieutenant Redd never returned to duty at UAMS and died on January 31, 2021 (Dkt. No. 50, n.3).

UAMS has no record of Mr. Washington presenting to its ED prior to the shooting on December 3, 2020 (Dkt. No. 51, ¶ 66).[15]

### III.    Legal Standard

#### A.    Summary Judgment

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact to be decided at trial. *Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UnitedHealth Group Inc. v. Executive Risk Specialty Ins. Co.*, 870 F.3d 856, 861 (8th Cir. 2017) (citing Federal Rule of Civil Procedure 56 and noting that summary judgment is proper if there is no genuine issue of material fact for trial). Under such circumstances, the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322. "In ruling on a motion for summary judgment, '[t]he district court must base its determination regarding the presence or absence of a material issue of factual dispute on evidence that will be admissible at trial.'" *Tuttle v. Lorillard Tobacco Co.*, 377 F.3d 917, 923-24 (8th Cir. 2004) (internal citations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Johnson Regional Medical Ctr. v. Halterman*, 867 F.3d 1013, 1016 (8th Cir. 2017) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar

---

[15]    Even if Ms. McFadden has records of Mr. Washington's visit to UAMS ED on days prior to December 3, 2020, Ms. McFadden offers no medical records or other record evidence to support the denial of the statement of fact as it relates to an admission to UAMS ED on December 3, 2020, prior to the shooting. Accordingly, the Court deems the statement of fact as offered by the defendants undisputed for purposes of this motion under Federal Rule of Civil Procedure 56(e)(2).

summary judgment; rather, the dispute must be outcome determinative under prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).

However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984). The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 1997), *cert. denied*, 522 U.S. 1048 (1998). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 255 (1986).

### B.    Qualified Immunity

With respect to claims brought pursuant to 42 U.S.C. § 1983 against defendants in their individual capacities, "[q]ualified immunity shields a government official from liability unless his conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mallak v. City of Baxter*, 823 F.3d 441, 445 (8th Cir. 2016) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). The Court's assessment of the qualified immunity issue follows a two-part inquiry. The Court considers "whether the facts alleged or shown, construed most favorably to the plaintiff[ ], establish a violation of a constitutional right," and "whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful." *Small v. McCrystal*, 708 F.3d 997, 1003 (8th Cir. 2013).

### IV.    Analysis

#### A.    Defendants' Motion For Summary Judgment On Ms. McFadden's Excessive Force Claim

The Fourth Amendment prohibits unreasonable seizures.  U.S. Const. Amend. IV.  The right to be free from an unreasonable seizure includes the right to be free from excessive force used to effect a seizure.  *See Andrews v. Fuoss*, 417 F.3d 813, 818 (8th Cir. 2005).  Ms. McFadden brings an excessive force claim against the Officer Watson for her use of force to seize Mr. Washington on December 3, 2020 (Dkt. No. 34, ¶¶ 89–105).  Ms. McFadden asserts that the force used by Officer Watson was unnecessary, objectively unreasonable, and excessive in violation of Mr. Washington's Fourth Amendment rights (*Id.*, ¶ 105).

"'Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment. . . .'"  *Chambers v. Pennycook*, 641 F.3d, 898, 905 (8th Cir. 2017) (alterations in original) (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).  With respect to the officers' actions, the critical inquiry for this Court "is whether the amount of force used was objectively reasonable under the particular circumstances."  *Brown v. City of Golden Valley*, 574 F.3d 491, 496 (8th Cir. 2009) (internal quotation marks omitted).  In making this determination the Court looks to the "specific circumstances, such as 'the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  *Peterson v. Kopp*, 754 F.3d 594, 600 (8th Cir. 2014) (quoting *Graham*, 490 U.S. at 396).

This analysis alone, on the record evidence with all reasonable inferences construed in favor of Ms. McFadden, precludes this Court from granting summary judgment or qualified immunity in favor of defendants on Ms. McFadden's excessive force claim.  There are disputed issues of fact created by the record evidence that a jury should resolve.  Further, the Court rejects any suggestion by defendants that the law on excessive force applicable to Officer Watson's

conduct and by which entitlement to qualified immunity is measured was not clearly established at the time of these events (Dkt. No. 50, at 19–20).

Defendants argue that, observing the events on video, the discussion at the truck window between Lieutenant Redd and Mr. Washington evolved into "'a tense and uncertain' situation in which Officer Watson had to make a 'split-second' decision on whether Lieutenant Redd's life was in danger requiring her to use deadly force to stop the threat." (Dkt. No. 50, at 15). Defendants argue that the stop was a felony stop, due to the stolen truck (*Id.*, at 12). However, Officer Watson admits that Mr. Washington was never violent toward her and never threatened her at all (Dkt. No. 59-1, at 126). Further, although Officer Watson admits that when she gave Mr. Washington an instruction to put his car in park he followed it (*Id.*), defendants argue that Mr. Washington refused the commands of law enforcement to get out of the truck and to turn off the truck (Dkt. No. 50, at 12).

Defendants also concede in their briefing that under controlling law "[a]n officer should give 'some warning' when it is 'feasible' to do so," (Dkt. No. 50, at 11–12 (quoting *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012) (citing *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985))). However, defendants also maintain that "both common sense and governing case law provide that 'it is reasonable to forgo a warning' in a high-pressure situation that requires a 'split-second' decision." (Dkt. No. 15, at 12 (citing *McElree v. City of Cedar Rapids*, 983 F.3d 1009, 1018 (8th Cir. 2020)). Here, defendants argue that it was "reasonable for Officer Watson to forego giving the warning 'stop or I'll shoot,' and her use of deadly force was objectively reasonable." (*Id.*). Defendants cite to *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012), a case in which an officer repeatedly ordered the suspect to get on the ground but did not include a specific warning such as "get on the ground or I'll shoot," and the Court found the use of force was

reasonable (*Id*. at 15–16). Defendants argue that the lack of a more specific warning from Officer Watson under these circumstances was reasonable (*Id*.).

The record evidence is that Officer Watson told Mr. Washington to "stop. Stop the vehicle," that Mr. Washington complied with Officer Watson's first command, but that Officer Watson gave Mr. Washington no warning the second time to inform Mr. Washington that if he failed to comply she would use deadly force (Dkt. No. 59-1 at 132–33). When asked why she did not do so, she responded, "Didn't have enough time." (*Id.*, at 133). Officer Watson admitted it would take about a second to say "or I'll shoot," and Officer Watson claims that while running along the side of the truck she said multiple times to stop the vehicle but never said "or I'll shoot." (*Id.*, at 134). There are genuine issues of material fact in dispute as to whether Officer Watson had enough time to provide a warning prior to the use of deadly force. Further, there is Eighth Circuit caselaw that indicates when a warning is feasible, the failure to warn adds to the unreasonableness of the use of deadly force. *Nance v. Sammis*, 586 F.3d 604 (8th Cir. 2009) (citing cases); *Ngo v. Storlie*, 495 F.3d 597, 603 (8th Cir. 2007) (concluding "A warning under these circumstances was feasible and the failure to take an extra moment to assess the situation adds to the unreasonableness of [Officer] Storlie's actions under the circumstances.").

Whether the use of deadly force by Officer Watson was reasonable turns, in part, on whether the "suspect poses an immediate threat to the safety of the officer or others." *Wallace v. City of Alexander, Arkansas*, 843 F.3d 763, 768 (8th Cir. 2016) (citing *Loch v. City of Litchfield*, 689 F.3d 961, 965 (8th Cir. 2012)); *see Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985). Officer Watson maintains that she shot Mr. Washington to protect Lieutenant Redd (Dkt. No. 59, at 15 n.5 (citing Dkt. No. 59-1, at 106)). However, Officer Watson acknowledges that Lieutenant Redd "was voluntarily putting his hands into the car and hanging onto stuff," not that Mr. Washington

reached outside the car (Dkt. No. 59-1, at 130–131).  Officer Watson acknowledges that she had

less than a lethal weapon on her person; she had OC spray (*Id.*, at 130).  Perhaps most importantly,

whether Officer Watson fired her weapon before or after Lieutenant Redd was on the ground is

material to determining whether Lieutenant Redd was in imminent danger of death or in risk of

serious bodily injury at the hands of Mr. Washington at time Officer Watson fired her weapon.

*See* 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting

him dead."); *Peterson*, 754 F.3d at 600 (concluding that use of pepper spray on "a non-fleeing,

non-resisting, non-violent misdemeanant" was unreasonable).  The Court determines that this

material dispute of fact, among others, precludes the Court from determining whether Officer

Watson used unconstitutionally excessive force on Mr. Washington under the circumstances and

precludes the Court from granting defendants qualified immunity.  *See Moore v. Indehar*, 514 F.3d

756, 763 (8th Cir. 2008).

According to Ms. McFadden's version of the facts, Mr. Washington did not pose an

immediate threat to Lieutenant Redd or another person's safety at the time that Officer Watson

used deadly force because "[a]ccording to Defendant Barber and Defendant Smith, Mr. Redd was

already on the ground at the time Defendant Watson fired her weapon at Mr. Washington" (Dkt.

No. 59, at 11).  The Eighth Circuit has determined that *Ludwig v. Anderson*, 54 F.3d 465 (8th Cir.

1995), "shows it was clearly established that mere seconds after an immediate threat has passed is

sufficient time for an officer to conclude the immediate threat has passed, extinguishing any prior

justification for the use of deadly force."  *Cole Est. of Richards v. Hutchins*, 959 F.3d 1127, 1135

(8th Cir. 2020).

Assuming without deciding that Officer Watson was justified in unholstering her weapon

because of the stolen vehicle making this a felony traffic stop, there are material disputes of fact

regarding whether Mr. Washington posed a threat at the time that Officer Watson used deadly force because the parties dispute whether Mr. Washington was dragging Lieutenant Redd along the side of the truck at the time that Officer Watson fired her weapon as defendants maintain, or whether Lieutenant Redd was already on the ground at the time that Officer Watson fired her weapon as Ms. McFadden maintains (Compare Dkt. No. 59-1, at 141 (where Officer Watson testifies that Lieutenant Redd was hanging on the truck when she fired the weapon); and Dkt. No. 59-2, at 50 (where Corporal Blagg testifies that as Lieutenant Redd went to fall, Officer Watson fired the shot); with Dkt. No. 59-3, at 17 (67:25-68:4) (where Officer Smith testifies that Lieutenant Redd was on the ground when Officer Watson fired her weapon); and Dkt. Nos. 59-4, at 16, 63:11–15 and 59-13 at 9:55 (where Officer Barber states that Lieutenant Redd was on the ground when Officer Watson fired her weapon)).

Likewise, the parties do not agree on whether Mr. Washington posed an immediate threat to the officers or another person's safety, even after Lieutenant Redd was on the ground. Officer Watson admits that at no time was there anybody in front of the truck that Mr. Washington was in and that at no time was there anybody in the path of that vehicle (Dkt. No. 59-1 at 132). Officer Smith testified that Mr. Washington's foot was on the brake pedal when he was shot (Dkt. No. 59-3, at 72). Having examined the record evidence in the light most favorable to Ms. McFadden, the Court determines there are genuine issues of material fact in dispute with respect to whether Mr. Washington posed an immediate threat to the officers or another person's safety, even after Lieutenant Redd was on the ground.

In their reply to Ms. McFadden's response, defendants acknowledge that "Plaintiff may interpret some of the video differently than Defendants with regard to whether Lieutenant Redd was on the ground at the time the shot was fired, it is unquestionable that the events happened

quickly" (Dkt. No. 71, at 28). In his statement to ASP investigators prior to his death in January 2021, Lieutenant Redd stated that "[i]t was kinda like when I hit the ground, the gunshot went off." (Dkt. No. 59-10, at 10:31).[16] There are disputes of fact between the testimony of Officer Watson and the testimony of Officer Smith and Officer Barber about whether Lieutenant Redd was hanging on the truck and in danger or on the ground and out of danger when Officer Watson fired the shot at Mr. Washington that preclude granting summary judgment.

Further, the video evidence offered by both parties is inconclusive on these points. None of the video evidence offered by the parties has audio that indicates when the shot was fired by Officer Watson in relation to when Lieutenant Redd releases himself from the truck (Dkt. Nos. 49-15). The video of "west parking row 11D" may show a flash from Officer Watson's weapon, but the video does not offer conclusive evidence of the shot being fired or show a clear view of Lieutenant Redd because of obstructions with the view of the truck (Dkt. Nos. 49-15 (Video 13B)). Accordingly, the Court cannot determine based on the video evidence of "west parking row 11D" when Officer Watson fired the shot in relation to when Lieutenant Redd released himself from the truck (*Id.*). Video from "west parking row 11B" does not have a clear view of when Officer Watson fired her weapon (Dkt. No. 49-15 (Video 13C)). Defendants offer an expert who attempted to merge the videos, but the expert acknowledges that the videos have "unusual characteristics," "freeze or jump ahead in time," and do not completely sync (Dkt. No. 49-14, at 9). The Court cannot determine based on the video evidence when Officer Watson fired the shot in relation to

---

[16]    The Court will consider Lieutenant Redd's statements to the ASP undisputed for purposes of this motion because Ms. McFadden does not object to defendants' use of the statement, and it would likely be admissible at trial given that Lieutenant Redd is no longer available to testify. *See* Fed. R. Civ. P. 56(d)(3); Fed. R. Evid. 804(a)(4).

when Lieutenant Redd released from the truck (*Id.*), and, at this stage, the Court must assume the facts in the light most favorable to Ms. McFadden.[17]

Defendants assert that, under controlling law, whether Mr. Washington was in a mental health crisis at the time and whether defendants should have known of Mr. Washington's condition does not impact the analysis on whether an immediate and significant threat is posed by the suspect (Dkt. No. 50, at 16 (relying on *Quinones v. City of Edina*, 77 F.4th 1192, 1196 (8th Cir. 2023); *Kong v. City of Burnsville*, 960 F.3d 985, 993 (8th Cir. 2020)).  Even accepting this argument as true for purposes of resolving the pending motion, the Court reaches the same result.

The Court also addresses an additional point; defendants assert more than once that "officers were not sure if Washington had a weapon" (Dkt. No. 71, at 30).  Defendants provide no record evidence to establish this as a reasonable suspicion of objective officers on the scene in regard to Mr. Washington at the time of the events.  The Eighth Circuit previously determined that, by 2009, "*Nance v. Sammis* shows it was clearly established that an individual does not pose an immediate threat of serious physical harm to others when, although that person is seemingly in possession of a gun, he does not raise it toward another or otherwise appear 'ready to shoot' in the moment."  *Cole, as the Personal Representative of the Estate of Richards v. Hutchins*, 959 F.3d 1127, 1134 (8th Cir. 2020) (citing *Nance v. Sammis*, 586 F.3d 604, 611 (8th Cir. 2009)).  Again,

---

[17] Defendants, in their moving papers, cite to Ms. McFadden's deposition testimony during which Ms. McFadden was asked to read paragraph 27 of defendants' answer to the operative complaint (Dkt. No. 50, at 13–14; 71, at 30–31).  The paragraph in the answer recites purported facts and then makes statements about what Officer Watson believed about Officer Watson's use of force.  The Court does not find Ms. McFadden's deposition testimony, or defendants' arguments regarding it, dispositive as to this claim, given that the Fourth Amendment requires a reasonable factfinder to determine whether, with respect to the officers' actions, the amount of force used was objectively reasonable under the particular circumstances, not with regard to Officer Watson's subjective beliefs.

no record evidence supports such an assertion as to Mr. Washington, and the Court views the record evidence at this stage in the light most favorable to Ms. McFadden.

According to the Eighth Circuit Court of Appeals:

> At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter. *Id*. at 249, 106 S.Ct. at 2510. Rather, the court's function is to determine whether a dispute about a material fact is genuine, that is, whether a reasonable jury could return a verdict for the nonmoving party based on the evidence. *Id*. at 248, 106 S.Ct. at 2510. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [the non-movant's] favor. *Id*. at 255, 106 S.Ct. at 2513. 'If reasonable minds could differ as to the import of the evidence,' summary judgment is inappropriate. *Id*. at 250, 106 S.Ct. at 2511.

*Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

In viewing the evidence before the Court in the light most favorable to Ms. McFadden as the Court must at this stage, the Court finds that there are genuine disputes of material fact regarding whether the use of deadly force was reasonable under the circumstance presented and that a jury should determine whether Officer Watson's use of force against Mr. Washington on December 3, 2020, was reasonable.

### B.    Defendants' Motion For Summary Judgment On Ms. McFadden's Failure To Intervene Claims

To prove that officers failed to intervene or protect Mr. Washington, Ms. McFadden "must show, *inter alia,* that the officer observed or had reason to know that excessive force would be or was being used." *Hicks v. Norwood,* 640 F.3d 839, 843 (8th Cir. 2011) (quotation and citation omitted). In other words, to prevail on a claim of failure to intervene Ms. McFadden must prove that an officer committed the underlying constitutional violation of using excessive force. *See Zubrod v. Hoch*, 907 F.3d 568, 580 (8th Cir. 2018). Furthermore, the Court may impose liability for failing to intervene only if Ms. McFadden shows that "the officer [who failed to intervene was]

aware of the abuse *and* the duration of the episode [was] sufficient to permit an inference of tacit collaboration." *Grider v. Bowling*, 785 F.3d 1248, 1253 (8th Cir. 2015) (emphasis added).

### 1. Ms. McFadden's Failure To Intervene Claim Against Officers Smith, Barber, And Watson

In the operative complaint, Ms. McFadden brings failure to intervene claims against Officers Smith, Barber, and Watson (Dkt. No. 34, at 23–24). In Ms. McFadden's response to the motion for summary judgment, she states:

> Plaintiff acknowledges that officers are only liable under a failure to intervene theory where they had a realistic and reasonable opportunity to intervene. *See Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972) (holding that liability for failure to intervene exists only if the beating occurred in the officer's presence or was otherwise within his knowledge). Based on the evidence established during discovery, Plaintiff cannot say Defendant Smith and Defendant Barber had a reasonable opportunity to intervene to prevent Mr. Redd's use of physical force against Mr. Washington or Defendant Watson's subsequent use of deadly force on Mr. Washington. Therefore, Plaintiff makes no response to Defendant Smith and Defendant Barber's assertion of qualified immunity.

(Dkt. No. 59, n.4). Because Ms. McFadden acknowledges that Officers Smith and Barber had no opportunity to intervene to prevent Lieutenant Redd's use of force or to prevent Officer Watson's subsequent use of deadly force, the Court grants defendants' motion for summary judgment as to Ms. McFadden's failure to intervene claims against Officers Smith and Barber (Dkt. No. 49).

Defendants moved for summary judgment as to Ms. McFadden's failure to intervene claim against Officer Watson (*Id.*, ¶ 3). Ms. McFadden does not mention her failure to intervene claim against Officer Watson in her response to defendants' motion for summary judgment (Dkt. No. 59, at 12, n.4; 31–33). Ms. McFadden only argues in response to defendants' motion for summary judgment that Corporal Blagg failed to intervene (*Id.*, at 31–33). Accordingly, the Court determines that Ms. McFadden has abandoned her failure to intervene claim against Officer

Watson. The Court grants defendants' motion for summary judgment on Ms. McFadden's failure to intervene claim against Officer Watson.

> ### 2.    Ms. McFadden's Failure To Intervene Claims Against Corporal Blagg

In her the operative complaint, Ms. McFadden asserts that Corporal Blagg had "reason to believe that Mr. Washington was a mentally ill person and/or a person having a mental health crisis" (Dkt. No. 34, ¶ 120). Ms. McFadden asserts that Corporal Blagg knew that Lieutenant Redd's "aggressive attempts at using force" on Mr. Washington would increase the likelihood that one of the officers would use unnecessary and/or excessive force on Mr. Washington (*Id.*, ¶¶ 121–122).

Defendants moved for summary judgment on Ms. McFadden's claim that Corporal Blagg failed to intervene to stop Officer Watson's use of force on the grounds that her use of force was not a constitutional violation prompting the officers to intervene (Dkt. No. 50, at 17). Defendants observe that, to state a claim for failure to intervene, the officer needs to have had the duty, opportunity, and ability to intervene (*Id.*, at 17–18 (citing *Jennings v. Davis*, 476 F.2d 1271, 1275 (8th Cir. 1973)). Defendants argue that less than two seconds passed between the time that Lieutenant Redd began being dragged by the truck and the time that Officer Watson fired her weapon (*Id.*, at 18). Defendants maintain that Corporal Blagg did not have the opportunity or ability to intervene to stop Officer Watson under these circumstances (*Id.*, at 18).

In her response to the motion for summary judgment, Ms. McFadden changes her failure to intervene argument and asserts that Corporal Blagg failed to intervene when *Lieutenant Redd* "deviated from accepted police practices" and used excessive force on Mr. Washington (Dkt. No. 59, at 31–33). The Court observes that a failure to intervene claim based on *Lieutenant Redd's* use of force is different from the failure to intervene claim Ms. McFadden brought in her operative

complaint based on *Officer Watson's* use of force (Compare Dkt. No. 34, ¶¶ 120–122, with Dkt. No. 59, at 31).  Regardless, the outcome is the same.

Ms. McFadden's argument in her response to defendants' motion for summary judgment is that Corporal Blagg failed to intervene when Lieutenant Redd "aggressively grabbed" Mr. Washington through the partial open driver side window (Dkt. No. 59, at 31).  Ms. McFadden's claim is based, in part, on what may be a misstatement of the facts, as set forth above.  Ms. McFadden interprets Lieutenant Redd's statement that he was "wrestling" with Mr. Washington for control of the steering wheel to mean that he was using force against Mr. Washington.  Ms. McFadden also cites to a statement from Officer Smith that he believes he remembers telling the ASP investigator that Lieutenant Redd was "reaching into the truck through the driver-door window" and that he was "struggling with Mr. Washington" (Dkt. No. 59-3, at 16).  Lieutenant Redd, in his statement to ASP, further stated that he "reached for the ignition and I was going to try to take the keys out." (Dkt. No. 49-7, at 2–3).  According to Lieutenant Redd, "when he started trying to turn the wheel, I grabbed the wheel because we had some momentum going.  So I kept making him overturn.  And we were headed for the wall of the parking deck" (*Id.*, at 3).  Lieutenant Redd wanted him to hit the wall, but he "wasn't winning that fight," and he believed that "by the way the truck had turned that he was fixing to give it gas because he had gotten it straightened." (*Id.*).  It is at that point that Lieutenant Redd decided that he was going to "get my hand out because I wasn't going to get involved in being drug down the highway at 60 years old." (*Id.*).

Corporal Blagg testified that, "[o]nce the vehicle started moving, I could see Redd grabbing the steering wheel and trying to turn the steering wheel." (Dkt. No. 49-10, at 14).  Corporal Blagg stated that Lieutenant Redd was initially trying to reach toward the ignition, but after the truck started moving, Lieutenant Redd was reaching toward the steering wheel (*Id.*).  According to

Corporal Blagg, after the truck started moving, he could not see if Mr. Washington grabbed Lieutenant Redd's arms or hands (*Id*., at 17–18). In other words, from the record evidence, it is not clear that Lieutenant Redd grabbed Mr. Washington at any point.

Even if Lieutenant Redd grabbed Mr. Washington, Ms. McFadden asserts that "Blagg was shoulder-to-shoulder" with Lieutenant Redd and "could have stopped the smaller, older [Lieutenant] Redd from reaching in or at least pulled him out once he started." (Dkt. No. 59, at 31–32). The evidence in the record before the Court taken in the light most favorable to Ms. McFadden does not support these assertions. As an initial observation, it does not appear to the Court from its review of the video evidence in the record that Lieutenant Redd was smaller than Corporal Blagg (Dkt. No. 49-15 (Video 13B)). Additionally, from the time that Lieutenant Redd arrived at the truck window until the shooting, the situation evolved rapidly; at most, five seconds elapsed from the time Corporal Blagg arrived at the truck before Mr. Washington began moving in the truck (*Id*.). There is no evidence on the record before the Court that Lieutenant Redd alerted Corporal Blagg to his intention to reach into the vehicle to turn off the truck, to put the truck in park, or to steer the vehicle. Further, there is no evidence that Corporal Blagg could have anticipated Lieutenant Redd was going to attempt to reach into the vehicle, to turn it off, to put it in park, or to steer the vehicle. The evidence in the record before the Court shows that this was a rapidly evolving situation and that Corporal Blagg did not have the opportunity or ability to react to prevent his commanding officer's actions.

The Court determines that no reasonable jury could conclude based on the record evidence before it with all reasonable inferences from that record evidence construed in favor of Ms. McFadden that Corporal Blagg had an opportunity or ability to intervene. Therefore, the Court grants defendants' motion for summary judgment as to this claim.

C.    **Defendants' Motion For Summary Judgment On Ms. McFadden's EMTALA Claim**

Ms. McFadden claims that the Board violated EMTALA by failing to screen, stabilize, and treat Mr. Washington, who was in the midst of a mental health crisis and in need of help (Dkt. No. 34, ¶¶ 130-144).

To establish a claim under EMTALA, Ms. McFadden must establish:  (1) that UAMS has both a Medicare provider agreement with the Secretary of Health and Human Services and an emergency room or ED; (2) that Mr. Washington went to the UAMS ED; (3) that Mr. Washington requested examination or treatment; (4) that Mr. Washington had an emergency medical condition; (5) that UAMS did not provide Mr. Washington with an appropriate medical screening examination; and (6) as a direct result of the conduct of UAMS, Mr. Washington suffered personal harm.[18]  *Hunt ex rel. Hunt v. Lincoln Cnty. Mem'l Hosp.*, 317 F.3d 891, 893, n.4 (8th Cir. 2003).

The relevant regulation provides that, with respect to an individual who is not a patient, the phrase "[c]omes to the emergency department" means that the individual:

> (1)    Has presented at a hospital's dedicated emergency department, as defined in this section, and requests examination or treatment for a medical condition, or has such a request made on his or her behalf.  In the absence of such a request by or on behalf of the individual, a request on behalf of the individual will be considered to exist if a prudent layperson observer would believe, based on the individual's appearance or behavior, that the individual needs examination or treatment for a medical condition;

> (2)    Has presented on hospital property, as defined in this section, other than the dedicated emergency department, and requests examination or treatment for what may be an emergency medical condition, or has such a request made on his or her behalf.  In the absence of such a request by or on behalf of the individual, *a request on behalf of the individual will be considered to exist if a prudent layperson*

---

[18]  The statute provides that "if any individual . . .  *comes to the emergency department* and a request is made on the individual's behalf for examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination . . ."  42 U.S.C. § 1395dd(a) (emphasis added).

*observer would believe, based on the individual's appearance or behavior, that the individual needs emergency examination or treatment*;

42 C.F.R. § 489.24 (emphasis added).

The parties do not dispute that UAMS is a participating hospital as defined by EMTALA (Dkt. No. 70-8, at 15). The parties disagree, however, whether Mr. Washington presented to the UAMS ED or anywhere else at UAMS for treatment and whether a prudent individual would believe based on Mr. Washington's behavior that Mr. Washington needed treatment.

Defendants argue that Ms. McFadden provides no evidence in the record to support her assertion that Mr. Washington was on the UAMS campus on December 3, 2020, for the purpose of seeking a medical exam or treatment or that Mr. Washington appeared or acted in such a way to suggest to a prudent layperson observer that he needed a medical exam or treatment prior to the shooting on UAMS's campus on the morning on December 3, 2020 (Dkt. No. 50, at 21). The Court agrees that, on the record evidence before the Court, there is no record that Mr. Washington checked into the UAMS ED or that Mr. Washington told any UAMS employee that he needed medical assistance of any kind on December 3, 2020, prior to the shooting (Dkt. Nos. 49-3, at 24-25; 49-4; 70-8, at 65-66).

Ms. McFadden attempts to turn this around by stating that there is no proof that Mr. Washington was not in the UAMS ED on that day prior to the shooting, but Dr. Maddox testified at his deposition that, if Mr. Washington had checked into the UAMS ED to be seen, there would be a record, yet there is not such a record—meaning that Mr. Washington did not seek treatment at the UAMS ED the morning of December 3, 2020, prior to the shooting according to defendants (Dkt. No. 49-18, at 3–4, 59:21-60:3). In other words, there is record evidence that Mr. Washington was not seen in the UAMS ED on December 3, 2020, prior to the shooting, and Ms. McFadden

has failed to meet proof with proof on this point testified to by Dr. Maddox to create a disputed issue of material fact.

Ms. McFadden also attempts to argue that Nurse Liston testified that Mr. Washington came from the direction of the UAMS ED to support Ms. McFadden's theory that Mr. Washington must have sought treatment at the UAMS ED (Dkt. No. 59, at 34), but Nurse Liston later clarified that she "did not see [Mr. Washington] pull out of the emergency department . . . [but] that [] the direction he came from, was up the road from the ER." (Dkt. No. 59-5, at 30:3-7).  Ms. McFadden also makes much of the fact that Mr. Washington told Nurse Liston that "he had come from the emergency department." (Dkt. No. 59, at 34 (quoting Dkt. No. 59-5, at 29:25-30:7)).  However, Ms. McFadden, in making this statement, obscures a fact that she includes in her operative complaint, that at 1:24 a.m. on December 3, 2020, Mr. Washington was discharged from CHI St. Vincent ED, where he was treated and released for back pain (Dkt. No. 34, ¶ 42).  Mr. Washington's admission earlier that morning to CHI St. Vincent's ED is supported by documents in the record before the Court (Dkt. No. 71-4).

Throughout her argument in response to the defendants' motion for summary judgment on the EMTALA claim, Ms. McFadden urges that the UAMS employees should have noticed Mr. Washington's hospital "wristband," which Ms. McFadden insinuates came from UAMS ED (Dkt. No. 59, at 34).  There is evidence in the record that Officer Watson noticed an armband on Mr. Washington's wrist, consistent with one issued at a hospital and one that made Officer Watson's thoughts go to the possibility that Mr. Washington was a patient or former patient (Dkt. No. 59-1, at 123-124).  Ms. McFadden points to no record evidence to support that the armband on Mr. Washington's wrist came from UAMS.  Defendants argue in response that it is safe to assume that Mr. Washington may have received the hospital wristband when he was a patient at CHI St.

28

Vincent ED and was still wearing it an hour or so later while he was on the UAMS campus at the time of the incident (Dkt. No. 71, at 33). Mr. Washington has not come forward with anything other than speculation and conjecture to refute Dr. Maddox's statement that there is no record of Mr. Washington presenting to UAMS ED on December 3, 2020, prior to the shooting.

Next, Ms. McFadden argues that Mr. Washington's statements to UAMS employees—Nurses Liston and Franco and Mr. Bailey—that he was being chased by a man with a machete were sufficient for a prudent layperson to believe that Mr. Washington needed an emergency examination or treatment under EMTALA. Ms. McFadden contends that, "[w]hen trying to determine if someone needs emergency services for a mental health crisis, a reasonable practitioner should look for outward signs, such as a disheveled appearance and bizarre statements reflecting visual or audio hallucinations." (Dkt. No. 59, at 35).

Nurse Liston testified at her deposition that Mr. Washington was dressed casually in jeans and a t-shirt (Dkt. No. 59-5, at 24). According to Nurse Liston, during her two interactions with Mr. Washington, Mr. Washington never asked for treatment, never asked for help, and did not have a flat affect, and Nurse Liston concluded, based on her experience, that Mr. Washington might be "on something or there was something else he was dealing with" (Dkt. No. 59-5, at 38). Nurse Liston stated that she did not necessarily believe that someone was chasing Mr. Washington with a machete, but she was not going to risk that, so she started working her way back inside the building (*Id.*, at 34).

Ms. McFadden points to an interview that Nurse Franco gave to an ASP investigator stating that Mr. Washington was mumbling to himself, was "not in his right mind," and was "erratic"

(Dkt. No. 59-15, at 3:35; 7:35).[19]  Although the Court has reviewed the record evidence, the Court determines that Nurse Franco's statement to the ASP investigator is not evidence that the Court can consider in support of Ms. McFadden's response to defendants' motion for summary judgment to create a disputed issue of material fact because under Federal Rule of Civil Procedure 56(c)(1) a party responding to a motion for summary judgment must support that response with depositions, affidavits, or declarations.  Fed. R. Civ. P. 56(c)(1)(A).  Ms. Franco's statement to ASP was not made under oath or under penalty of perjury, and Ms. McFadden has not explained why she could not have obtained a sworn affidavit, written declaration, or other competent evidence from her proposed witness.  *See Banks v. Deere*, 829 F.3d 661, 668 (8th Cir. 2016) (citing Fed. R. Civ. P. 56(d)) (determining that summary judgment was appropriate because Banks's reliance on unsworn and unattested statements of co-workers did not support his harassment claim).

Mr. Bailey, who was on the UAMS grounds crew on December 3, 2020, had a conversation with Mr. Washington, whom Mr. Bailey described as dressed in jeans and a shirt (Dkt. No. 49-9, at 4–5).  Mr. Bailey told Mr. Washington that a hose was dragging from his truck, and Mr. Washington responded that he was being chased by someone with a machete (*Id.*, at 4).  Mr. Bailey told Mr. Washington that he would get him some help (*Id.*, at 5).  Mr. Bailey testified that he did not "ever consider that maybe this guy was not all there in terms of his mental acuity." (*Id.*, at 5).  According to Mr. Bailey, he did not suspect Mr. Washington was having a mental health or drug-induced crisis (*Id.*).  While Mr. Washington seemed to Mr. Bailey to be "jittery and nervous" and

---

[19]    As to the description of Mr. Washington's behavior offered by Nurse Franco, Dr. Maddox testified at his deposition that the mumbling that she described as "erratic behavior," that led Nurse Franco to conclude that Mr. Washington was not in his right mind, was behavior that a person could consider when evaluating someone under EMTALA but that a person talking to himself, without more, would not be "any reason to believe that there's an emergency medical condition." (Dkt. No. 70-8, at 92:4–12).

not "acting normally," Mr. Bailey stated that "I would be too, you know, if I was in that position.
. . [s]omeone chasing me with a machete." (Dkt. No. 59-6, at 6). At approximately 2:46 a.m., Mr.
Bailey called the UAMS PD to report that a man in a white truck told Mr. Bailey that the man was
being chased by someone with a machete (Dkt. Nos. 49-1,at 10; 49-4, at 6). Ms. McFadden's
claim is that the UAMS employees did not take proper steps to offer Mr. Washington help
as required by EMTALA. This claim fails because, under the express wording of the
statute, even if this Court assumes without deciding for purposes of resolving this motion
that EMTALA applied to this situation and applied to Mr. Washington's encounters on
UAMS property on December 2 and 3, 2020, this portion of EMTALA applies only if the
hospital employees as prudent layperson observers believed, based on Mr. Washington's
appearance or behavior, that Mr. Washington needed emergency examination or treatment.
There is insufficient evidence on the record before the Court, even when that record
evidence is viewed in the light most favorable to Ms. McFadden, to meet this standard with
respect to Mr. Washington under the circumstances.[20]

Ms. McFadden maintains that UAMS should have preserved video from December 2 and
3, 2020, to prove that Mr. Washington did not present to the UAMS ED for an exam or treatment
(Dkt. No. 59, at 34). UAMS responds that it could not have anticipated under the circumstances
of the case that Ms. McFadden would raise an EMTALA claim or that defendants might need to
support the absence of a medical record that Mr. Washington was in the UAMS ED with a video
also showing that Mr. Washington was not in the UAMS ED those days (Dkt. No. 71, at 34–35).

---

[20] None of the officers at the scene that interacted with Mr. Washington determined that
he was mentally ill, emotionally disturbed, or in a mental health crisis (Dkt. No. 59-1, at 97:21-23;
49-8, ¶ 13; 59-2, at 63:22-64:5; 59-3, at 63:17-20, 75:2-4; 59-4, at 58:12-15, 72:11-22).

The Court determines that no reasonable jury could conclude, based on the record evidence before it with all reasonable inferences from the record evidence construed in favor of Ms. McFadden, that Mr. Washington went to the UAMS ED, requested examination or treatment from a UAMS employee, or that, based on Mr. Washington's appearance and behavior, a reasonably prudent layperson would have believed that Mr. Washington needed an emergency examination or treatment. As result, because Ms. McFadden is unable to establish a disputed issue of material fact regarding the required elements of a claim under EMTALA, defendants are entitled to summary judgment on the EMTALA claim.

### D.    Defendants' Motion For Summary Judgment On Ms. McFadden's Wrongful Death Claim

Defendants move for summary judgment on Ms. McFadden's state law wrongful death claim asserting that, when the Court grants summary judgment and dismisses all of Ms. McFadden's federal claims, the Court may refuse to exercise jurisdiction over Ms. McFadden's remaining state-law wrongful death claim (Dkt. No. 50, at 22). As set forth in this Order, the Court has not dismissed all of Ms. McFadden federal claims. Accordingly, the Court denies defendants' motion for summary judgment as to Ms. McFadden's state law wrongful death claim.

### V.    Conclusion

For the reasons set forth in this Order, the Court denies Ms. McFadden's motion to strike (Dkt. No. 77). The Court grants, in part, and denies, in part, defendants' motion for summary judgment (Dkt. No. 49). The Court grants defendants' motion for summary judgment and grants judgment in favor of defendants on Ms. McFadden's failure to intervene claims against Officers Smith, Barber, Watson, and Corporal Blagg (*Id.*). Officer Smith, Officer Barber, and Corporal Blagg are dismissed with prejudice as named defendants from this lawsuit. The Court grants defendants' motion for summary judgment and grants judgment in favor of defendants on Ms.

McFadden's EMTALA claim, and the Board is dismissed with prejudice as a named defendant from this lawsuit (*Id*.).   The Court denies defendants' motion for summary judgment on Ms. McFadden's claim against Officer Watson for excessive force in violation of the Fourth Amendment and denies defendants' motion for summary judgment on Ms. McFadden's state law wrongful death claim (*Id*.).

So ordered this 22nd day of September, 2025.

Kristine G. Baker
Chief United States District Court Judge